**Warren J. WRIGHT, Plaintiff,**

v.

**B. F. HUNTLEY FURNITURE COM-PANY, Defendant.**

**No. C–46–WS–60.**

United States District Court
M. D. North Carolina,
Winston-Salem Division.

Aug. 21, 1961.

Robert M. Bryant, Winston-Salem, N. C., for plaintiff.

Hudson, Ferrell, Petree, Stockton & Stockton, Winston-Salem, N. C., for defendant.

---

EDWIN M. STANLEY, Chief Judge.

This is an action by the plaintiff, a citizen and resident of the Commonwealth of Massachusetts, against the defendant, a North Carolina corporation, to recover damages for personal injuries sustained when struck by a carton of furniture while opening a railroad freight car. The basis for the action is the alleged negligence of the defendant in loading the freight car.

The case was tried by the court without a jury. At the conclusion of the trial, the parties were afforded the privilege of filing requests for findings of fact and conclusions of law, and briefs in support of their respective positions.

The requests for findings of fact and conclusions of law, and briefs of the parties having been received, the court, after considering the pleadings and evidence, including exhibits and stipulations filed, and briefs of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## Findings of Fact

1. The plaintiff is a citizen and resident of the Commonwealth of Massachusetts.

2. The defendant is a North Carolina corporation and maintains its principal office and place of business at Winston-Salem, North Carolina.

3. The amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

4. The defendant for many years has been engaged in the manufacture of furniture, and its product is sold to retail furniture dealers located in various parts of the United States.

5. At the time of the accident complained of, the plaintiff was employed by Jordan Marsh Company, of Auburndale, Massachusetts, a retail furniture dealer. Jordan Marsh Company is a regular customer of the defendant, and maintains a warehouse at Auburndale, Massachusetts, which is used for receiving and storing furniture.

6. On April 1, 1958, the defendant shipped a carload of furniture to the Jordan Marsh Company. The boxcar was loaded, closed and sealed by the defendant, after which it was moved from Winston-Salem, North Carolina, to Auburndale, Massachusetts, by the following common carriers by rail: Norfolk & Western Railroad, initial carrier; Western Maryland Railroad; Reading Railroad; Central of New Jersey Railroad; and New York Central Railroad, intermediate carriers; and Boston & Albany Railroad, delivering carrier. The boxcar of furniture was placed on the Jordan Marsh Company's railway siding on the morning of April 10, 1958.

7. On April 10, 1958, and for some 15 years prior thereto, the plaintiff's duties as an employee of Jordan Marsh Company were those of a warehouse receiver of merchandise. A part of such duties consisted of opening railway boxcars containing merchandise shipped to the Jordan Marsh Company, and checking the merchandise while it was being unloaded by other employees. The plaintiff knew from his experience of the manner in which railway boxcars were usually loaded with furniture, and was aware of the general practice of shippers to load heavier and larger pieces of merchandise on the bottom of the load and smaller pieces on top. He also knew from his experience that the smaller pieces on top of the load would usually shift in transit if not securely braced, and that such was a common occurrence.

8. On the morning of April 10, 1958, at about 8 o'clock, the plaintiff, in the course of his duties as receiver of merchandise for his employer, was assigned

to open and check a shipment of furniture contained in a railway boxcar which was then located on a siding at the warehouse of the Jordan Marsh Company. This was the car of furniture that had been shipped by the defendant to the Jordan Marsh Company on April 1, 1958. The floor of the warehouse platform was on practically the same level as the floor of the boxcar. In the performance of this assignment, the plaintiff first broke the seal and then opened the boxcar door on the side next to the platform, and looked inside the car. He saw that it was loaded with furniture, and that the load extended all the way to the top of the car. The car door was shored, either with planks or metal straps, about three-fourths of the way from the bottom to the top.

9. After opening the door on the warehouse side, the plaintiff went to the opposite side of the boxcar for the purpose of opening the other door. Since there was no platform on this side, plaintiff had to stand on the ground, which was about five feet below the floor of the boxcar, while breaking the seal and opening the door. After the door was opened some ten or twelve inches, it became stuck because of rust on the door runners. The plaintiff then looked through the opening and could see that the load also extended all the way from the floor to the top on this side of the car. He further observed that the shipment was from the defendant and was intended for his employer. The plaintiff then proceeded to use a crowbar to loosen the door, after which he used his hands to open the door the balance of the way. The moment the plaintiff completed the opening, he was struck on the head by a pasteboard carton containing a night table which had fallen from the top of the load. The carton weighed from fifty to sixty pounds, and plaintiff was knocked unconscious by the blow.

10. After using the crowbar to loosen the door, and while opening the door the balance of the way with his hands, the plaintiff never at any time looked up to determine if there were loose cartons in the car that would fall, or would be likely to fall, when the door was opened. He never saw the carton that struck him until he regained consciousness a short time after the accident. The plaintiff stated that he did not look up for the reason that he was in a stooped, awkward position, and was in no position to look up when he was pushing a heavy door. After regaining consciousness, plaintiff stated that he saw several other cartons on top of the load near the door "ready to fall."

11. There was no obstruction to prevent plaintiff from seeing the carton that struck him. If he had looked before the accident, he could have seen the loose cartons, including the carton that struck him, and could have thereby avoided the accident.

12. The defendant had no control over the car of furniture from the time it left its warehouse on April 1, 1958, until it was delivered to the railroad siding of the plaintiff's employer on April 10, 1958, and there is no evidence as to what happened to the shipment from the time it left Winston-Salem until it arrived at the railway siding at Auburndale, Massachusetts.

13. The plaintiff gave conflicting evidence as to his reason for opening the door opposite the warehouse. On one occasion he stated the purpose for opening the door was to enable him to read the labels on the cartons and make sure that they were intended for his employer, and on another occasion he stated the purpose was to provide a means for trucks bringing other merchandise to his employer to unload through the boxcar in the event all the warehouse unloading areas were in use. It is found that the latter explanation is the more plausible one.

14. At the time his deposition was taken, the plaintiff stated that when he first opened the door on the warehouse side he could see that the load had shifted, and that the smaller pieces were on top. He also stated he knew the shifting of loads while in transit to be a common

occurrence. At the trial he testified differently, and stated that he did not believe he should have testified as he did when his deposition was taken.

15. The plaintiff was alone at the time of his injury and no one else saw how the accident happened.

16. The evidence was conflicting as to the shoring material used on the boxcar. The plaintiff testified that wooden planks were used for shoring in front of both doors, and that this same shoring material had been used in shipments received by his employer from the defendant since 1947. The production manager of the defendant stated that Signode steel straps had been exclusively used for shoring since 1947, and that to his knowledge no other material had been used. So far as the evidence discloses, both materials, if properly used, would serve the same purpose, and there was no evidence indicating that the type of material used and the methods employed by the defendant to shore the boxcar had any relationship to the accident.

17. The Southern Weighing and Inspection Bureau, an agency of the various railroads, has as one of its primary functions the policing and checking of packaging and loading methods employed by railroad shippers. At various times during a period of several years preceding the accident, and continuing to the present time, this agency, in accordance with its usual procedures, had caused its inspectors to make unannounced calls from time to time on the defendant for the purpose of checking the methods and procedures employed in packaging freight and loading boxcars. On each occasion the defendant had been found to be complying with the approved rules and regulations of the railroads. The uncontradicted evidence discloses that the safety precautions used by the defendant in packaging and loading freight are equal or superior to the safety precautions employed by the various other shippers of furniture in this area, and that the methods and procedures employed by the defendant are generally accepted and approved in the furniture trade.

18. There was introduced in evidence a pamphlet containing rules regulating the safe loading of freight in cars, as prepared and published by the Association of American Railroads, indicating that incomplete layers in shipments should be avoided whenever possible, and that when incomplete layers have to be loaded, cross bracing should be used. While the evidence does not disclose that the night tables at the top of the car constituted an incomplete layer, it does disclose that no special bracing was used to secure the cartons in which the night tables were packed. The chief clerk in the freight department of the Norfolk and Western Railroad, the initial carrier, stated that the method employed by shippers in packing and loading freight was customarily inspected by the Southern Weighing and Inspection Bureau, and that he was not familiar with the pamphlet issued by the Association of American Railroads, and that such pamphlet was not available in his office. The production manager of the defendant stated that he knew of the existence of the pamphlet, but that inspections for his company were handled by the Southern Weighing and Inspection Bureau.

19. During the forty-two years the production manager of the defendant corporation had been employed by the defendant, the defendant has never had a complaint similar to that made by the plaintiff.

20. The plaintiff was seriously injured as a result of the accident, and has expended a considerable sum of money in the treatment of his injuries.

## Discussion

Both parties agree that when the alleged negligence occurs in one state and the resulting injury in another, the substantive law of the state where the injury occurs governs the case. Consequently, the substantive law of Massachusetts is to be applied in this case. However, both parties further agree that Massachusetts rules relating to negligence, contributory

negligence and damages are the same as the North Carolina rules.

■ The plaintiff first argues that the doctrine of res ipsa loquitur should be applied in this case. It is uniformly held, however, that the doctrine has no application "when the instrumentality causing the injury is not under the exclusive control or management of the defendant * * *." Lane v. Dorney, 1959, 250 N.C. 15, 108 S.E.2d 55, 60.

Also see Saunders v. Norfolk & W. Ry. Co., 1923, 185 N.C. 289, 117 S.E. 4, 29 A.L.R. 1258. The rule, which seems to be adhered to in all jurisdictions, is stated in 38 Am.Jur., Negligence, Section 300, as follows:

"It is essential to the application of the doctrine of res ipsa loquitur that it appear that the instrumentality which produced the injury complained of was at the time of the injury under the management or control of the defendant or of his agents and servants. * * * The doctrine does not apply where the agency causing the accident was not under the sole and exclusive control of the person sought to be charged with the injury. * * *"

■ The boxcar in question had been beyond the control and management of the defendant for ten days prior to the plaintiff's injury, and had been handled by six different railroads. In Fisher v. Minneapolis & St. L. Ry. Co., 1952, 8 Cir., 199 F.2d 308, a wrongful death action, it was held that the doctrine of res ipsa loquitur was inapplicable where death occurred from injuries sustained while unloading transmission line poles from a railroad flatcar, since the defendant had no control of the load at the time of the injury. In Snodgrass v. Risley, 1952, 196 Or. 506, 250 P.2d 392, it was held that in an action by an employee of the consignee of a truckload of logs, charging the shipper with negligence in loading, the doctrine of res ipsa loquitur was not applicable since the logs had been out of the control of the shipper, and in the hands of the trucker, for

some time before the plaintiff was injured. In Butler v. Norfolk Southern Railway Company, D.C.E.D.N.C.1956, 140 F.Supp. 601, 605, the doctrine was held inapplicable "because a prerequisite for application of the doctrine is that the harmful instrumentality must have been in the exclusive control of the defendant." Accordingly, in line with what appears to be the uniform rule in all jurisdictions, it is held that the doctrine of res ipsa loquitur has no application to the facts here presented.

The plaintiff next argues that the evidence establishes negligence on the part of the defendant, particularly in failing to brace the night stand cartons in the boxcar in such a way as to prevent them from falling when the boxcar door was opened by the consignee.

The duty required of the shipper of goods by common carrier is set out in 9 Am.Jur., Carriers, Section 468, as follows:

"A shipper of goods by common carrier who undertakes to load the shipment is under a duty to *exercise reasonable care* to do so in a manner *reasonably safe* for unloading, and a violation of this duty will render the shipper liable for personal injury to or death of the consignee or his employee proximately caused thereby, if the person injured or killed was entitled to do the unloading and *was in the exercise of proper care for his own safety*." (Emphasis supplied.)

■■ In Yandell v. National Fireproofing Corp., 1953, 239 N.C. 1, 79 S.E. 2d 223, 227, it is stated that if the shipper loads goods in a negligent manner, it is liable for injuries caused "to an employee of the consignee who undertakes to unload the *negligently loaded car*." (Emphasis supplied.) The rule as stated in United States Steel Corporation v. McCraney, 1958, 5 Cir., 257 F.2d 457, 462, is that a shipper is required to load the car so that, when it reaches its destination " * * * there would be no hidden defects in the loading, and

that the consignee could, by the exercise of proper care, safely remove the lading. * * * "

■ The uncontradicted evidence discloses that the methods and procedures employed by the defendant in packaging and loading its furniture on freight cars had been checked from time to time over a period of several years by the Southern Weighing and Inspection Bureau, an agency of the various railroads, and that on each occasion the defendant had been found in compliance with the rules and regulations of the railroads. The evidence further disclosed that the safety precautions used by the defendant in packaging and loading its furniture were equal or superior to the safety precautions used by other shippers of furniture in the Winston-Salem area, and that the methods and procedures in use by the defendant conformed to the standards and customary methods and procedures usually employed and approved in the furniture trade. The plaintiff bases its claim of negligence on the failure of the defendant to follow the recommendations of the Association of American Railroads by bracing an incomplete layer of freight. The answer to this argument is that there was no evidence that the top layer of night stand cartons constituted an "incomplete" layer. The only evidence on this point was that the night stand cartons were loose upon arrival, and that they had not been braced. It is entirely possible that the cartons could have constituted a complete layer, and in some manner had shifted while in transit. Moreover, there was no attempt on the part of the plaintiff to show that shippers were bound by the rules and regulations of the Association of American Railroads, or as to what extent these rules were available to or used by other shippers. The chief clerk in the freight department of the Norfolk and Western Railroad, the initial carrier, stated that the rules of the Association of American Railroads were not available through his office, and that safe loading methods and procedures were inspected in this area by the Southern Weighing and Inspection Bureau. He further testified that this was an agency set up by the railroads for the purpose of policing and inspecting loading methods and procedures employed by shippers. This evidence stands unchallenged. The production manager of the defendant stated that he was aware of the existence of the rules of the Association of American Railroads, but that his company had employed standards and procedures suggested by the Southern Weighing and Inspection Bureau, and that the same was true of all other furniture manufacturers with which he was acquainted. No employee of the defendant had any independent recollection as to how this particular car was loaded, since the defendant was not notified of the accident until a considerable time after it occurred. This made it impossible to show more than the methods and procedures generally followed. What caused the night stand cartons to become loose in the car during transit is purely guesswork. However, there is no evidence which discloses in any particular that the car was so negligently loaded that it could not be safely unloaded, and it is concluded that the evidence fails to disclose any form of negligence on the part of the defendant company or its employees. Anderson v. Southern Ry. Co., 1927, 4 Cir., 20 F.2d 71.

■■ Even if the plaintiff had established actionable negligence on the part of the defendant, the plaintiff still would be entitled to no recovery for the reason that the evidence clearly discloses that the negligence of the plaintiff was the direct and proximate cause of the accident. There can be little question but that if plaintiff had exercised the slightest precaution while opening the boxcar door, his injury would not have occurred. He had a duty to exercise proper care for his own safety, and the evidence clearly shows that this was not done. The plaintiff described the accident in the following manner:

"I proceeded then to open the door with the pinch bar, and when I got it started I dropped the pinch bar,

and I started to push the door, and the next thing I knew I was lying out on the ground. So, when I came to, I looked around to see what hit me. I saw this carton lying along side of me; and I knew it was a night table, and I also in that position looked up, and I could see where that piece had come out of the top of the car where there was nothing to prevent it coming out; and also there were a couple more loose pieces ready to drop out. * * *"

He then gave the following testimony:

"Q. How far did you say you had pushed the door open before being struck? A. I pushed the door wide open. The door was wide open, because, of course, I could see that after I was struck.

"Q. Were you standing on the ground at the time? A. When I pushed the door.

"Q. When you were pushing the door? A. I was out in the yard. Of course, I was naturally standing in a bent position pushing the door.

*    *    *    *    *    *

"Q. You started to open it all the way? A. Yes, Sir.

"Q. You never looked up again? A. No, Sir.

"Q. The next thing was, you say, something hit you? A. Yes, Sir.

*    *    *    *    *    *

"Q. And when you looked up, you could see there was a night stand, or there were night stands, all across the top? A. Yes, Sir.

*    *    *    *    *

"Q. You said the door was rusty? A. The runners.

"Q. You had to lossen it with a crowbar? A. Yes, Sir.

"Q. When you loosened it, you could push it with your hands? A. Yes.

"Q. When you were pushing didn't you look up to see if there was any merchandise there? A. I couldn't do that, and push the door.

"Q. Why? A. It was such an awkward position. I couldn't open the door and look up.

"Q. You would be interested in seeing if there was anything that would fall out? A. I always worked with reasonable care, but I couldn't be in a position to look up when I was pushing a heavy door. I was in a stooped position.

*    *    *    *    *    *

"Q. It was daylight at the time of the accident, wasn't it? A. About 8:00, between 8:00 and 8:10. Yes, Sir.

"Q. It was daylight? A. Yes, Sir.

"Q. This was out in the open area? A. Yes, Sir."

■ From the above it is abundantly clear that the plaintiff failed to exercise any degree of care for his own safety. If the attending circumstances were such as to make it impossible for him to exercise the simple precaution of looking, he should have obtained help in opening the door. The condition of the car was apparent to anyone who would look. The danger was open and visible. The plaintiff had many years of experience in opening freight cars, and had knowledge of the fact that loads frequently shifted in transit. "A man has no right to be careless and reckless in face of open and apparent danger, and if he proceeds under such circumstances he is guilty of contributory negligence to a degree that bars a recovery." Anderson v. Southern Ry. Co., 1927, 4 Cir., 20 F.2d 71, 73. The accident was brought about by the plaintiff's own careless act, done with full knowledge of the peril involved, and it is concluded that the negligence of the plaintiff caused or proximately contributed to his injury.

## Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter.

2. The plaintiff has not shown actionable negligence on the part of the defendant.

3. The plaintiff was guilty of negligence which caused or proximately contributed to his injury.

4. The plaintiff is entitled to recover nothing of the defendant, and the complaint should be dismissed with prejudice.

Counsel for defendant will present an appropriate judgment.